**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Elkins**


**UNUM LIFE INSURANCE COMPANY**
**OF AMERICA**,

        Plaintiff,

  v.                                    **Civil Action No. 2:08-CV-73**
                                             **Judge Bailey**

**CHARLES W. WILSON**,

        Defendant.


**ORDER GRANTING MOTION ON BEHALF OF CHARLES W. WILSON**
**FOR SUMMARY JUDGMENT AND DENYING UNUM LIFE INSURANCE**
**COMPANY OF AMERICA'S MOTION FOR SUMMARY JUDGMENT**

Pending before this Court are a Motion on Behalf of Charles W. Wilson for Summary Judgment (Doc. 34) and Unum Life Insurance Company of America's Motion for Summary Judgment (Doc. 36). As discussed below, this Court will grant the Motion on Behalf of Charles W. Wilson for Summary Judgment (Doc. 34) and deny Unum Life Insurance Company of America's Motion for Summary Judgment (Doc. 36).

This civil action is brought by Unum Life Insurance Company of America ("Unum") seeking damages for breach of contract, restitution of benefits paid under a reservation of rights, and a declaratory judgment determining that the defendant is not entitled to recover under a disability policy. Count I of the Complaint (Doc. 3) alleges that Charles W. Wilson ("Wilson") has breached the insurance contracts by failing to provide essential information. Count II alleges that Wilson has breached the covenant of good faith and fair dealing by

1

failing to perform his obligations under the insurance contracts. Count III seeks restitution of benefits paid under the insurance contracts, and Count IV seeks a declaration that Unum has no obligation to continue the payment of benefits, that Unum is entitled to the return of all sums paid to Wilson, and that Unum is entitled to cancellation of the insurance policies.

## Facts

Charles W. Wilson purchased two individual disability policies from Unum. The first policy was effective in January, 1986, while the second was effective in January, 1992. The policies provide a combined monthly benefit of $6,750.00 per month in the event that Wilson becomes "totally disabled" from his "occupation."

On March 10, 2004, while he was a member of the law firm of Wilson & Bailey, P.L.L.C., Wilson, then 56, underwent a six vessel or "sextuple" cardiac bypass procedure. Thereafter, Wilson filed an application to receive the benefits of the disability policies that he had purchased.

On August 26, 2004, Dr. Charles Lively reported that Wilson had experienced a noticeable inability to concentrate as he had in the past and had difficulty with memory. Wilson was advised to avoid situations that would cause emotional stress or anxiety. (Doc. 34-4, p. 4).

On September 29, 2004, Dr. Stephen Smith, Wilson's family physician, reported that Wilson had persistent fatigue with daily rest required. Dr. Smith reported that Wilson's ability to concentrate had changed since his surgery and that he had noticeable difficulty with short-term memory. Dr. Smith opined that due to the claimant's physical condition, particularly his persistent fatigue, and mental status changes, he would no longer be able

to practice law efficiently. Dr. Smith further reported that the claimant's cognitive deficits had affected his mood and made him noticeably anxious at times. Dr. Smith further opined that Wilson should avoid situations of stress or anxiety. (Id.)

On October 5, 2004, Unum Associate Disability Benefit Specialist Heather Toomey wrote to Wilson informing him that, based upon a review of medical records submitted by Dr. Smith, "it would appear reasonable that your condition would preclude you from performing the duties of your occupation from March 10, 2004 to the present." The letter further stated that Unum needed to review records from Wilson's cardiologist, Dr. O'Keefe, in order to consider benefits beyond August 8, 2004. The letter also requested copies of 2002 and 2003 business tax returns, CPA review statements, and profit and loss statements and balance sheets.

Unum has presented a "phone memo" dated October 21, 2004, which reports a telephone conversation between Bradley Oldaker and an unidentified person. The memo reports that Oldaker was not aware that Wilson was claiming disability and that he was not disabled. (Doc. 39-6).

On October 26, 2004, a Unum field representative interviewed Wilson. The report of the interview states that Wilson was friendly and cooperative, but notes that he broke down crying about half way through the interview when talking about how much he wished he could still practice law. The report also notes that Wilson began to display subtle lapses in focus and would turn to his friend or son and ask them to explain the question. Wilson also tended to answer questions with long monologues. The representative also reported that Wilson seemed to have some degree of concentration lapses during the interview and did, at times, act and talk inappropriately for the circumstances of the interview. (Doc. 39-

3).

In the interview there was discussion of his job duties and real estate activities. Wilson described his role as "doing a lot of public relations, client development type of activities and acting as sort of a referral service for the younger lawyers in the group. He said that he had worked at home some of the time and at the office some of the time and basically was the point man for WC, product liability, asbestos cases, etc. but he didn't go to court or do anything involving actual legal duties. He said that he left the actual court actions to the younger lawyers." (Id.)

In the interview, Wilson stated that he did a lot of work with banks regarding loans, real estate transactions, deed transfers, wills and things of that nature. The representative stated, "As an example of what he did, Mr. Wilson said that a bank would hire him to execute the title transfer on a real estate transaction. He would do the title search, draw up the papers, get the proper signatures, etc." With respect to outside the practice, Wilson reported that he owned income producing real estate investments, but did not do any work outside the scope of his practice. Wilson stated that he was involved in five real estate entities. These were (1) Magnolia Associates, which manages the West Virginia Antique Market; (2) Staunton Pike Associates, which is a residential rental corporation; (3) Pelham Associates, a commercial real estate corporation; (4) Gateway Associates, a commercial real estate corporation; and (5) One Gateway Associates. (Id.)

Mr. Wilson stated that he received checks when there was income, but that the actual management of the entities was done by Steve McQue and Shirley Marchland. He stated that he was not involved in the day to day operations of the entities, although the representative reported that Wilson's son chided Wilson that he was involved to some

degree as an owner.  (Id.)

With respect to medical issues, the Unum representative reported, "I asked him if his cognitive problems had gotten better over time and he again was noncommittal saying that they had perhaps improved slightly.  Mr. Wilson said that he was told by his doctors to avoid stress and because of that and his lack of stamina and focus, he was not capable of performing his duties."  (Id.)

On January 25, 2005, Mr. Wilson was examined by Marc W. Haut, Ph.D., who performed a neuropsychological evaluation at Unum's request.  Testing revealed that Wilson had some changes with his cognitive function, suggesting a neurological process.  There were indications of mild frontal lobe dysfunction.  On the WAIS-III, Wilson obtained a verbal IQ of 105, a performance IQ of 89, and a full scale IQ of 98.  Wilson was functioning in the low average range of intellectual functioning.  Dr. Haut noted that he would have expected Wilson to be functioning at least in the above average range.  He opined that Wilson's deficits in frontal lobe functioning certainly may impact his ability to operate a law practice.  Dr. Haut noted that there was no indication of embellishment of symptoms and that other factors such as choice, career dissatisfaction, entitlement, secondary gain, or lack of motivation were not influencing his performance. (Doc. 39-10).

On March 23, 2005, the Unum representative met with Bradley Oldaker, a member of the law firm.  Mr. Oldaker stated that the firm was primarily a plaintiffs' firm, that Wilson was not engaged in plaintiffs' work, and that Wilson had been primarily a real estate attorney since 1996 or 1997.  He noted that Wilson also did wills and estate work.  Since Wilson was doing other types of work, he was physically located in an adjacent building.  Oldaker reported that Wilson was notified in November, 2004, that he would be out of the

firm, effective January 1, 2005, because he was no longer bringing in revenue to cover his overhead.  (Doc. 39-2).

An August 9, 2005, letter from Michael V. O'Keefe, M.D., Wilson's cardiologist, states that postoperatively Wilson found it difficult to concentrate or perform at a higher intellectual function, and experienced recurring memory problems.  Dr. O'Keefe reported that Wilson underwent a neuropsychiatric evaluation which concluded that Wilson "suffered from a deficit of higher order which would be correlative with post cardiopulmonary bypass and the resultant micro hemorrhages that normally occur during this procedure.  With the extent of his coronary disease, doubtless there is atherosclerotic disease involved in the cerebral tree as well and these changes, to date, appear to be irreversible.  He has problems with repetitive performance.  He has difficulty with short- and long-term memory." (Doc. 34-3).

Dr. O'Keefe summarized by stating "Mr Wilson is a gentleman who suffers from diffuse atherosclerosis of all native coronary arteries status post coronary revascularization with functional class II dyspnea of effort.  He suffers from significant neuropsychiatric changes secondary to a long and extensive pump run, complicated likely by further atherosclerotic disease of the cerebral circulation."  (Id.)

Finally, Dr. O'Keefe reported that "[t]hese changes have been permanent since his surgery and have not improved.  It is my feeling, given the extent of his underlying atherosclerotic disease and the changes that have occurred during his cardiopulmonary bypass are irreversible and negate his possible employment in any gainful manner secondary to memory disturbances and lapses.  These have been correlated by an independent neuropsychiatric evaluation at West Virginia University and his status is

6

permanent and likely progressive." (Id.)

On March, 28, 2006, Unum Disability Benefit Specialist Heather Toomey wrote to Wilson's former law firm[1] and stated that Wilson met the definition of total disability. She then informed the firm of the conditions for obtaining the policy benefit. One of those conditions was that "the Insured was working full time in the Business when the total disability began." Ms. Toomey, however, did not raise any issue with that requirement, but focused on whether the firm had actually purchased Wilson's interest. (Doc. 36-2).

By decision dated June 23, 2006, the Social Security Administrative Law Judge granted disability benefits to Wilson, finding him disabled, as defined by the Social Security law. (Doc. 34-4).

On February 21, 2008, a Unum representative met with Harriett Attanasio, Wilson's former secretary. Ms. Attanasio informed the representative that from the mid-1990s through 2004, Wilson was engaged primarily in the practice of real estate law and wills. He also would meet with firm clients and refer them to another member of the firm. He would also help resolve questions or problems referred to him by members of the firm. About two years before the surgery, Wilson began slowing down. During that period he spent less time in the office, but spent approximately 30 hours per week on firm business. Ms. Attanasio stated that Wilson suffered a coronary event which interrupted his work in February or March, 2004. After that, most of her time and much of his time, as permitted by his health, was spent finishing existing firm real estate business. She does not believe that he personally attended any closings after his heart problem. After his coronary event,

---

[1] The former law firm also had a policy with Unum to assist in any buyout in the event of Wilson's disability.

Wilson's actual work was limited to reviewing and signing documents which she would take to his home or hold for him when he came to the office. (Doc. 39-1).

On July 10, 2009, the deposition of Dr. O'Keefe was taken. In the deposition, Dr. O'Keefe testified that Wilson "has short-term memory problems which is probably from the cardiopulmonary bypass run as well as mild depression. He is unable to sustain any gainful thought process at this point in time and certainly from the standpoint of being a lawyer, it is clearly not possible." (Doc. 36-6).

When asked whether heart bypass surgery creates a risk of some damage to the brain, Dr. O'Keefe stated that it "correlates to the length of the heart-lung run, the longer the heart-lung run, the greater the micro hemorrhages occur in the brain. They also occur everywhere else in the body, but they're most noticeable in intellectual functions." (Doc. 36-7).

## Summary Judgment Standard

Rule 56(e) of the Federal Rules of Civil Procedure provides that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must– by affidavits or as otherwise provided in this rule– set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

Rule 56 further provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v.*

***Catrett***, 477 U.S. 317, 322 (1986).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 250 (1986).  Thus, the Court must conduct "the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  ***Anderson***, 477 U.S.at 250.

Additionally, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts."  ***Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.***, 475 U.S. 574, 586 (1986).  That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial.  Fed. R. Civ. P. 56(c); ***Celotex Corp.***, 477 U.S. at 323-25; ***Anderson***, 477 U.S. at 248.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  ***Anderson***, 477 U.S. at 249 (citations omitted).

<u>Discussion</u>

**I.     Breach of Contract**

The first cause of action asserted by Unum alleges that Wilson breached the insurance contracts by failing or refusing to provide Unum with information which it requested in 2007 and 2008.  While Unum argues that the information requested is necessary to evaluate his ongoing claim, the evidence presented suggests otherwise.

Wilson was found to be disabled by at least March 28, 2006, when Unum employee Heather Toomey wrote to Wilson's former law firm and stated that Wilson met the definition of total disability. All of the medical evidence presented to this Court is consistent with the fact that Wilson is permanently and totally disabled from engaging in his former occupation. Unum has failed to present any admissible evidence to the contrary, especially in light of Dr. O'Keefe's opinion that Wilson is totally and permanently disabled.

Unum has also failed to prevent any credible evidence that Wilson's occupation at the onset of disability was anything other than as a lawyer. The fact that Wilson invested in real estate ventures does nothing to change his basic occupation. Unum relies on a statement from Ms. Attanasio to indicate that Wilson also devoted time to his real estate investments, as many lawyers do. That same statement, however, indicates that Wilson spent thirty hours per week on law firm business.

Unum also relies on a telephone call memorandum reciting a call from Wilson's former partner, Bradley Oldaker, but that memorandum is clear hearsay. Unum presented no affidavit from Oldaker. That memorandum is also belied by the fact that Oldaker's firm sought the benefits of the buy/sell disability policy, which required Wilson to be totally disabled from his occupation as a lawyer and required that he be working as a lawyer at the time of the onset of his disability.

Unum also emphasizes that Wilson's firm was severing the relationship in January, 2005, because his billings did not meet his overhead. By late 2004, Wilson had been disabled for almost a year. It is not surprising that his billings would not cover his overhead. In fact, this is further evidence that Wilson was in fact disabled. He was unable to cover his overhead.

Unum also argues that the law firm was a plaintiffs' firm and that Wilson did not do plaintiffs' work. That is not relevant. The evidence shows that he was a real estate attorney and a "rainmaker" for his former firm - a real estate lawyer is still a lawyer. While Unum argues that while Wilson may be disabled from the practice of law, he is not disabled from real estate activities; such an argument is not relevant. In order to receive benefits under the policy, Wilson has to be disabled from his occupation at the time of disability. Whether he can do other things has no bearing under the language of the policy.

There is simply no evidence to support Unum's protestations that Wilson claimed to be a trial lawyer. This Court believes this to be deliberate mischaracterization of the facts. A further mischaracterization of the facts is found in Unum's allegation that Wilson has 137 outside properties. Nothing presented to this Court supports such an allegation.

Another example of mischaracterization is the fact that Unum attached to its memorandum six (6) leases which were executed by Wilson. Close examination of the leases reveals, however, that what is attached is three (3) copies of one lease and three (3) copies of another lease. While there are only two leases provided, Unum has attempted to mislead this Court to believe that there were six (6) leases.

The evidence presented, even when viewed in a light most favorable to Unum, compels a finding that Wilson is permanently and totally disabled from his occupation as

a lawyer.[2]  This Court finds that reasonable minds could not differ on these issues.[3]

In a similar case dealing with lawyer disability, *Teicher v. Regence Health & Life Ins. Co.*, 562 F.Supp.2d 1128 (D. Ore. 2008), the Court noted that:

> The record reflects Plaintiff's high-level executive functions, including his abilities to process and to learn new and complex information, are fundamentally impaired.  These abilities are integral to all of the core functions an attorney must perform to integrate, to synthesize, and ultimately to put to use vast amounts of detailed information in order to represent his clients adequately and to advance his clients' interests in negotiations or before a court.  Moreover, an attorney is not permitted to satisfy only some of the standards required by the profession.  The fact that Plaintiff can still read and write is not sufficient standing alone to meet the requirements of the profession even though those skills are important in performing the job of an attorney.
>
> * * *
>
> Moreover, even if Plaintiff were able to perform one or more of the material and substantial duties of his occupation, the record establishes Plaintiff

_____

[2] While the award of total disability benefits by the Social Security Administration "which is not known for handing out disability benefits easily," is not binding upon Unum or this Court, "it is persuasive evidence of how a disinterested and objective examiner would view" the evidence in this case.  *Wilson v. Life Ins. Co. of N. A.*, 424 F.Supp.2d 1146, 1157-58 (D. Neb. 2006).

[3] In fact, Unum concedes that the IME testing done at its own request revealed that Wilson had cognitive difficulties which would impair his ability to practice law.  (Doc. 37, p. 5).

cannot perform such duties "on a full-time basis" because of his reduced cognitive endurance.

* * *

If Plaintiff was not viewed as totally disabled in light of his impairments and his inability to meet the high cognitive demands required of a lawyer, the coverage of the LTD Policy would seem to be triggered only if Plaintiff "were essentially non-conscious." *See* **Saffle** [*v. Sierra Pacific Power Company Bargaining Unit Long Term Disability Plan*], 85 F.3d at 458. Such a perspective would contradict the purpose of the LTD Policy and the intent of the parties, which is to provide the insured with financial protection against a loss of the ability to work resulting from injury or sickness.

562 F.Supp.2d at 1140-41.

As a result, Unum's repeated demands for more information, coming some three years after the onset of disability are unreasonable and bear all the trappings of a witch hunt. In addition, Unum has not identified a single relevant information request which remains unsatisfied.

In Count I, Unum also complains that Wilson has failed to file regular, monthly proofs of loss to receive benefits. Being permanently and totally disabled, Wilson has no duty to do so. **Lusk v. Aetna Life Ins. Co.**, 156 W.Va. 549, 195 S.E.2d 163 (1973).

In **Lusk**, the West Virginia Supreme Court of Appeals reviewed a claim for total disability benefits and held that where eligibility for disability benefits has been established, it was not necessary to file another (or repetitive) proof of claim.

In reaching that decision, the **Lusk** court issued two syllabus points which are relevant to this case:

> 1.     A provision in a group accident and health insurance policy which provides that an employee will be entitled to benefits for any period during which the employee is wholly disabled by a disease or an accident if he is prevented by such disability from performing any and every duty pertaining to his occupation does not mean that the employee must be absolutely helpless.
>
> 2.     Clauses and provisions in insurance policies are construed most liberally in favor of the insured.

Syl. Pts. 1 & 2.

Based upon the foregoing, there is no genuine issue as to any material fact, and Wilson is entitled to judgment as a matter of law on Count I.

**II.      Breach of Duty of Good Faith and Fair Dealing**

In Count 2 of the Complaint, Unum alleges that Wilson's supposed failures described in Count I constitute a breach of the duty of good faith and fair dealing inherent in every contract.

Under West Virginia law, a claim for breach of the duty of good faith and fair dealing is not an independent cause of action, but rather is subsumed in the claim for breach of contract. *Pannell v. Green Tree Servicing, LLC*, 2009 WL 277627, *3 (S.D. W.Va. Feb. 5, 2009) (Faber, J.); *Cavcon, Inc. v. Endress & Hauser, Inc.*, 557 F.Supp.2d 706, 729 (S.D. W.Va. 2008) (Copenhaver, J.); *Stand Energy Corp. v. Columbia Gas Trans.*

*Corp.*, 373 F.Supp.2d 631, 644 (S.D. W.Va. 2005) (Chambers, J.). *See Highmark West Virginia, Inc. v. Jamie*, 221 W.Va. 487, 492, 655 S.E.2d 509, 514 (2007).

In *Stand Energy*, Judge Chambers held:

Defendants argue that West Virginia law does not recognize an independent cause of action for a breach of duty of good faith and fair dealing separate and apart from a breach of contract claim. Although this Court cannot find any cases in West Virginia directly on point with the present case, this Court held in *Hoffmaster v. Guiffrida,* 630 F.Supp. 1289 (S.D. W.Va. 1986), that "[t]he law ... implies a covenant of good faith and fair dealing in every contract for purposes of evaluating a party's performance of that contract." *Id.* at 1290. In other jurisdictions, this implied covenant is subsumed in the contract claim and cannot be pled as an independent cause of action. *See, e.g., Estrin v. Natural Answers, Inc.,* 103 Fed. Appx. 702, 705, 2004 WL 1444956 at *3 (4th Cir. 2004) (unpublished) (finding the district court did not err in dismissing a counterclaim for a breach of good faith and fair dealing because a separate claim is not recognized under Maryland law); *Harte-Hanks Direct Marketing/Baltimore, Inc. v. Varilease Tech. Fin. Group, Inc.,* 299 F.Supp.2d 505, 518 (D. Md.2004) (finding that under Michigan law a plaintiff may state a claim for breach of contract based upon an implied duty of good faith and fair dealing, but a breach of that "duty does not supply an independent cause of action where the plaintiff already is alleging breach of contract"); *RoTec Serv., Inc. v. Encompass Serv., Inc.*, 359 S.C. 467,

597 S.E.2d 881, 883-84 (2004) (agreeing with courts interpreting Georgia, Illinois, New York, and South Dakota laws that state an implied covenant of good faith and fair dealing does not provide an independent cause of action that is separate and apart from a breach of contract claim). Given these cases and this Court's prior consistent pronouncement in **Hoffmaster**, the Court agrees with Defendants and **DISMISSES** Plaintiffs' independent cause of action for good faith and fair dealing.

373 F.Supp.2d at 644.

This Court agrees with the above cases. Having granted summary judgment on the claim for breach of contract, this Court will grant summary judgment in favor of Wilson on Count 2 as well.

### III. Restitution

Count 3 seeks restitution for *all* benefits paid under the policies for the reasons alleged in Counts I and 2 of the Complaint. Having found that Wilson is entitled to judgment on Counts I and 2, Wilson is entitled to judgment on this Count as well.

### IV. Declaratory Judgment

Count 4 of the Complaint seeks a declaration as to the parties' respective rights under the two disability policies. Based upon the foregoing, this Court declares:

1. Wilson has met his obligations to furnish Unum with all relevant information and evidence pertinent to his claim;

2. Unum has an obligation to continue the payment of benefits to Wilson;

3. Unum is not entitled to the return of any sums paid to Wilson; and

4.      Unum is not entitled to cancellation of the policies.

## V.      Unum's Motion for Summary Judgment

As noted above, Unum has filed a motion for summary judgment seeking judgment in its favor on the counterclaim filed by Wilson.  The counterclaim asserts four causes of action: (1) first party bad faith practices on the part of Unum; (2) breach of contract; (3) intentional infliction of emotional distress; and (4) declaratory judgment.  Unum's Motion will be denied.

## 1.      Bad Faith

Unum first contends that Wilson's bad faith claim fails as a matter of law.  This Court cannot agree.  The West Virginia Unfair Trade Practices Act, W.Va. Code § 33-11-4, applies to all types of insurance, including the insurance issued in this case.  *Maher v. Continental Cas. Co.*, 76 F.3d 535, 543 (4th Cir. 1996); Syl. Pt. 1, *Stonewall Jackson Mem. Hosp. v. American United Life Ins. Co.*, 206 W.Va. 458, 525 S.E.2d 649 (1999). In *Stonewall*, the West Virginia Supreme Court stated:

> The appellees argue that the aforementioned portions of the Act apply only to "loss" claims submitted by an insured against a liability or indemnity-type policy, and are wholly inapplicable to claims made by a policyholder against an annuity insurance contract . . ..  We disagree.

206 W.Va. at 464, 525 S.E.2d at 655.

"'More than a single isolated violation of W.Va. Code, 33-11-4(9), must be shown in order to meet the statutory requirement of an indication of "a general business practice," which requirement must be shown in order to maintain the statutory implied cause of

action.'  Syllabus point 3, *Jenkins v. J.C. Penney Casualty Insurance Company*, 167 W.Va. 597, 280 S.E.2d 252 (1981)."  Syl. Pt. 3, *Dodrill v. Nationwide Mut. Ins. Co.*, 201 W.Va. 1, 491 S.E.2d 1 (1997).

"We conceive that proof of several breaches by an insurance company of W.Va. Code, 33-11-4(9), would be sufficient to establish the indication of a general business practice.  It is possible that multiple violations of W.Va. Code, 33-11-4(9), occurring in the same claim would be sufficient, since the term 'frequency' in the statute must relate not only to repetition of the same violation but to the occurrence of different violations.  Proof of other violations by the same insurance company to establish the frequency issue can be obtained from other claimants and attorneys who have dealt with such company and its claims agents, or from any person who is familiar with the company's general business practice in regard to claim settlement."  *Jenkins v. J. C. Penney Cas. Ins. Co.*, 167 W.Va. 597, 610, 280 S.E.2d 252, 260 (1981), *overruled on other grounds by State ex re. State Farm Fire & Cas. Co. v. Madden*, 192 W.Va. 155, 451 S.E.2d 721 (1994).

"We also have made clear that a plaintiff can prove a general business practice by showing several unfair settlement practices in the same claim.  We held in Syllabus Point 4 of *Dodrill* that:

> To maintain a private action based upon alleged violations of *W.Va.Code,* 33-11-4(9) in the settlement of a single insurance claim, the evidence should establish that the conduct in question constitutes more than a single violation of *W.Va.Code,* 33-11-4(9), that the violations arise from separate, discrete acts or omissions in the claim settlement, and that they arise from a habit,

18

custom, usage, or business policy of the insurer, so that, viewing the conduct as a whole, the finder of fact is able to conclude that the practice or practices are sufficiently pervasive or sufficiently sanctioned by the insurance company that the conduct can be considered a 'general business practice' and can be distinguished by fair minds from an isolated event."

215 W.Va. at 646, 600 S.E.2d at 358.

In **Maher v. Continental Cas. Co.**, 76 F.3d 535, 543 (4th Cir. 1996), the Fourth Circuit stated that "where an insurer is alleged to have engaged in more than one of the listed prohibited practices, that the violations occurred during the course of the insurer's processing of a single claim may be sufficient to establish a general business practice. [*Jenkins, supra*]. The factual basis for each violation, however, may not be the 'same isolated scenario.' **Russell v. Amerisure Ins. Co.,** 189 W.Va. 594, 433 S.E.2d 532, 536 (1993). The **Russell** caveat presents no difficulty for Maher in the instant proceeding, inasmuch as he had repeated contact with Continental and its claims agent over the course of several months."

In this case, Wilson alleges a violation of a number of subsections of W.Va. Code § 33-11-4(9). This Court finds that there is sufficient evidence on, at least, the following to overcome Unum's motion for summary judgment:

(a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue. As noted earlier in this Order, Unum has misrepresented a number of facts in this case and in its dealings with Wilson.[4]

---

[4] While ordinarily the actions of counsel are not imputed to the insurer due to the fact that an attorney retained by an insurer to represent an insured has an ethical duty to use

(d)  Refusing to pay claims without conducting a reasonable investigation based upon all available information.  While in this case, Unum paid the claim, it now seeks repayment of all benefits paid.  A reasonable jury could find that the investigation conducted by Unum was not reasonable.  *Jackson*, 215 W.Va. at 641, 600 S.E.2d at 353.  Even when a claim is paid, a claim for bad faith may be maintained.  *Mirandy v. Allstate Ins. Co.*, 151 F.3d 1029, 1998 WL 372630 (4th Cir. 1998) (unpublished).

(e)  Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed.   In this case, Unum confirmed coverage by paying benefits for three years, but now is paying under a reservation of rights and seeking repayment of all benefits paid.  A reasonable jury could find a violation of this subsection.

(f)  Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.  As noted above, this Court has found that liability to Wilson is clear under any definition - reasonable minds could not differ on this point.  The jury could find a violation of this subsection.

(g)  Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by the insureds, when the insureds have made claims for amounts reasonably similar to the amounts ultimately recovered.  While Unum correctly points out that Wilson did not institute the litigation, Wilson was forced to defend the litigation to protect his right to receive the policy benefits.

---

independent judgment on behalf of the client, *Jackson, supra*, 215 W.Va. at 647, 600 S.E.2d at 359, in this case counsel is directly retained to represent the insurer and is solely an agent of the insurer.

A reasonable jury could find violations of the above provisions and find that those violations constitute a "general business practice."  Accordingly, summary judgment on this ground will be denied.

**2.      Breach of Contract**

While Unum contends that the payment of the policy benefits under a reservation of rights insulates it from liability for breach of contract, this Court does not agree.  As noted above, this Court has found Wilson to be permanently and totally disabled.   A jury could find that Unum's attempt to recover all benefit payments and void the insurance contracts constituted a breach of contract.

Summary judgment on this ground will be denied.

**3.      Intentional Infliction of Emotional Distress**

Unum contends that there is no basis in fact to support a claim for intentional infliction of emotional distress.

"In order for a plaintiff to prevail on a claim for intentional or reckless infliction of emotional distress, four elements must be established. It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it."  Syl. Pt. 3, ***Travis v. Alcon Laboratories, Inc.***, 202 W.Va. 369, 504 S.E.2d 419 (1998).

"The first element of the cause of action is a showing by the plaintiff that the defendant's actions towards the plaintiff were atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency. The defendant's conduct "must be more than unreasonable, unkind or unfair; it must truly offend community notions of acceptable conduct.' *Grandchamp v. United Air Lines, Inc.,* 854 F.2d 381, 383 (10th Cir.1988)." *Travis, supra*, 202 W.Va. at 375, 504 S.E.2d at 425.

"We discussed the type of conduct by a defendant that a plaintiff must show to prove 'outrageousness' in *Tanner v. Rite Aid of West Virginia, Inc.,* 194 W.Va. 643, 461 S.E.2d 149 (1995). Quoting from the comments to *Restatement of Torts (Second),* § 46, we stated:

> d. Extreme and outrageous conduct. The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam."

*Id.*, quoting *Tanner*, 194 W.Va. at 650-51, 461 S.E.2d at 156-57.

In *Travis*, the West Virginia Supreme Court stated, however, that "[t]he defendant's knowledge that a plaintiff is particularly susceptible to emotional distress somewhat alters the above standards for determining whether conduct is 'extreme and outrageous.' According to the comments to § 46 of the *Restatement*:

The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some ... mental condition. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know. *Restatement of Torts (Second),* § 46, comment (f) [1965]."

*Id.*

"In determining whether a defendant's conduct is 'extreme and outrageous,' a finder

of fact may consider whether the extreme and outrageous character of the conduct arose from an abuse by the defendant of a position or relationship to the plaintiff, which gave the defendant actual or apparent authority over the plaintiff or power to affect the plaintiff's interests. *Restatement of Torts (Second),* § 46, comment (e) [1965]. '[T]he existence of a special relationship in which one person has control over another, as in the employer-employee relationship, may produce a character of outrageousness that otherwise might not exist.' *Bridges v. Winn-Dixie Atlanta, Inc.,* 176 Ga.App. 227, 230, 335 S.E.2d 445, 448 (1985)." *Id.*

In this case, given that Unum had control of a significant part of the finances of a disabled person, that Unum knew that Wilson had undergone a sextuple bypass and was told to avoid stressful situations, and that Unum proceeded to challenge Wilson's entitlement to benefits in the face of clear evidence that Wilson was entitled to benefits, this Court will not grant summary judgment on this cause of action.

**4.     Declaratory Judgment**

This Court has already ruled upon the issues in this claim in section IV above.

**Conclusion**

For the reasons stated above:

A.     The Motion on Behalf of Charles W. Wilson for Summary Judgment (Doc. 34) is **GRANTED**;

B.     Unum Life Insurance Company of America's Motion for Summary Judgment (Doc. 36) is **DENIED**.  Accordingly, this matter shall proceed to trial as to Counts 1-3 of Wilson's Counterclaim.

C.      This Court declares:

1.      Wilson has met his obligations to furnish Unum with all relevant information and evidence pertinent to his claim;

2.      Unum has an obligation to continue the payment of benefits to Wilson;

3.      Unum is not entitled to the return of any sums paid to Wilson; and

4.      Unum is not entitled to cancellation of the policies.

D.      Pursuant to **McCormick v. Allstate Ins. Co.**, 197 W.Va. 415, 425, 475 S.E.2d 507, 517 (1996) and **Jordan v. Grange Mut. Ins. Co.**, 183 W.Va. 9, 14, 393 S.E.2d 647, 652 (1990), this Court will award Wilson reasonable attorney's fees after the resolution of this case.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to any counsel of record herein.

**DATED:** October 28, 2009.


JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE